## MAGEE *v.* STATE.*

(Division B.   Dec. 6, 1926.)

[110 So. 5'00.   No. 26158.]

1. HOMICIDE.  *Where witness lays predicate for dying declaration out of jury's presence, testimony by other witnesses as to such statement is admissible.*

   Where a witness is introduced to lay the predicate of the dying declaration, and testifies that deceased was in a dying condition and fully realized his condition, and had given up all hope of recovery, and had made a statement, without said witness disclosing what the statement was, not being asked with reference thereto by either party, and other witnesses testified as to such statement, the evidence is admissible; the preliminary examination having been out of the hearing of the jury, and the defendant having had opportunity to interrogate such witness with reference thereto.

2. HOMICIDE.  *Where state relies on dying declaration, showing illicit relations between defendant, deceased's wife, and another man is permissible.*

   In a prosecution for murder, where the state must rely upon the dying declaration and the circumstances, it is permissible to show the illicit relations between defendant, wife of the deceased, and a third person, and to show that there had been violent quarrels and threats, prior to said killing, growing out of such illicit relations.

3. CRIMINAL LAW.  *Where instructions fully announced law as to what constitutes offense, referring to indictment to show elements of offense was not reversible error.*

   While it is improper, in a criminal case, to refer to the indictment as to the manner and form of the killing, to show the elements thereof, it is not reversible error where the law is fully announced as to what constitutes the crime in the other instructions.

4. HOMICIDE.  *Instruction as to right to take life of larger and stronger assailant must show defendant reasonably apprehended death or great bodily harm.*

   While, in a proper case, a person may take the life of an assailant, who is much larger and stronger than the accused, and able to

inflict death or great bodily harm by means of fist and feet, an instruction with reference thereto must contain proper hypotheses, and must show that the defendant reasonably apprehended such death or great bodily harm as a consequence of the assault.

5. CRIMINAL LAW. *Cry of deceased immediately after shots was admissible as res gestae.*

In a prosecution for murder, where there was no eyewitness, and where the attention of others was attracted to the killing by the shots, followed by the outcry of the person shot, "Somebody come here; my wife killed me," such outcry is part of the *res gestae,* and admissible as part thereof.

---

*Corpus Juris-Cyc. References: Criminal Law, 16CJ, p. 577, n. 85; p. 1046, n. 45; 17CJ, p. 324, n. 68; Homicide, 30CJ, p. 185, n. 5; p. 268, n. 77 New; p. 351, n. 25 New; p. 376, n. 66; On admissibility of dying declarations made under sense of impending death, see annotatation in 56 L. R. A. 381; 1 R. C. L, 357; 1 R. C. L. Supp. 190; 4 R. C. L. Supp. 40.

APPEAL from circuit court of Simpson county.

HON. W. L. CRANFORD, Judge.

Pendora Magee was convicted of murder, and she appeals. Affirmed.

*J. P.* and *A. M. Edwards,* for appellant.

I.   *The testimony shows beyond any doubt whatever that the deceased brought on the difficulty in which he lost his life.*   The defendant testified in her own behalf and said that the deceased came in the house cursing and abusing her, told her that he was going to kill her, struck her with his fist, and made for a pistol that he had placed under the head of his bed the night before, but that she got the pistol first and began backing towards the door of the house and firing the pistol as fast as she could. She said that she knew that if he got his hands on the pistol, he would kill her, and that she shot to save her own life. The homicide was committed by the defendant under apprehension reasonably entertained by her that her life was in imminent danger at the hands of the deceased at the time she fired the fatal shot.

*Long* v. *State,* 52 Miss. 23; *Cannon* v. *State,* 57 Miss. 147; *Cotton* v. *State,* 31 Miss. 504, 1 Mor. St. Cas. 915; *Head* v. *State,* 44 Miss. 731, 2 Mor. St. Cas. 1700.

II. *The court committed grave error in admitting the dying declarations of the deceased.* The proper predicate for the admission of the dying declaration was not laid in this case. The declarations of the deceased made by him should have been testified to by Dr. White in laying the predicate for the introduction of the dying declarations so that the court might ascertain whether they were admissible in evidence. *Owen* v. *State,* 59 Miss. 549; *Nelms* v. *State,* 13 S. & M. 500, 1 Mor. St. Cas. 509, 53 Am. Dec. 94n; *Merrill* v. *State,* 58 Miss. 65; *Ashley* v. *State,* 37 So. 960.

III. *We submit that the instruction for the state is erroneous, for the reason that it is unsupported by the proved facts in the case.* There was no eye-witness to the homicide except the defendant and she testified in her own behalf, and made a detailed statement as to how the homicide occurred, which according to her own testimony was justifiable in order to save her own life, or suffering some great bodily harm at the hands of the deceased. We submit that her statement is reasonable, and that it is uncontradicted by any competent evidence.

IV. *The court below committed grave error in refusing to grant the instruction asked for by the defendant.* The testimony shows that the deceased was a much larger and stronger person than the defendant, so much so that the defendant was wholly incapable of coping with him in a physical combat, and that she was liable to receive serious and great bodily injuries at the hands of the deceased. It also shows that deceased was a negro man, six feet, two inches tall, weight about one hundred eighty pounds, strong, healthy and heavy muscled; and

that the defendant is a negro woman not very strong, weight about one hundred fifty pounds. *Hill* v. *State,* 97 Miss. 304, 49 So. 145.

V. Dora Simmons, witness for the state testified to the following:

"Q. What did he say? A. He said, 'O Lord, come here somebody, my wife has done killed me.'

"Q. Did either one have a gun or weapon of any kind when you first saw them? A. When I got over there she had hold of the handle of the gun and he had hold of the barrel, and he said, 'Come here somebody, my wife has done shot me.' "

The court committed grave error in admitting this testimony in evidence over the objections of the defendant, for the reason it is irrelevant, incompetent and prejudicial to rights of defendant. *Haney* v. *State,* 92 So. 627; *Myers* v. *State,* 64 Miss. 333, 1 So. 735.

The judgment of the lower court should be reversed.

*Rufus Creekmore,* Special Assistant Attorney-General, for the state.

I. *The sufficiency of the evidence:* Counsel first argue that the evidence is insufficient to support the jury verdict of guilty. They say that the testimony conclusively shows that the defendant acted in self-defense and, therefore, that there is no evidence on which the verdict can stand. This statement is only qualifiedly true. The testimony of the defendant herself did show a case of self-defense, but the testimony of the state's witnesses showed the killing to have been unjustifiable and without cause. There was here presented a clear-cut question of fact, which question has been decided in favor of the state and against the defendant.

II. *The dying declaration.* Testimony shows beyond all question that the dying declaration was given under

the sanctity and with a sense of impending death. *Mc-Neill* v. *State,* 115 Miss. 678, 76 So. 625; *Ely* v. *State,* 128 Miss. 715, 91 So. 417; *Jones* v. *State,* 130 Miss. 703, 94 So. 851; *Woollard* v. *State,* 137 Miss. 808, 102 So. 781.

III.   Counsel objects to the action of the court in refusing the instruction requested by the defendant on page 22 of the record.   This instruction is erroneous because it ignores the fundamental principle of the plea of self-defense.   It ignores the fact that before the defendant is justified in taking human life he must believe himself to be in danger of receiving some bodily injury or to be in danger of death at the hands of the deceased. The mere fact that there was a disparity in size and that the defendant was liable to receive injury in the event they became engaged in combat is not sufficient, but he must actually believe that he will receive such injuries or bodily harm at the hands of the deceased.

Then, too, the defendant has received instructions which correctly state to the jury the law with reference to the rights of the defendant to take life when in danger, either real or apparent, of suffering death or great bodily harm at the hands of the deceased.

IV.   *Statements made by decedent at the time of the shooting.*   If made simultaneously with the time of the firing of the shots, there can be no question but that they are admissible as part of the res *gestae.*   If made a short time later, then they become admissible as a part of the dying declaration made by the defendant.

The only question at issue in this case, however, is whether or not she acted in self-defense; the fact that she did kill him is undisputed.   Clearly, she could have been prejudiced in no way by the admission of this testimony whether it was admitted correctly or erroneously.

The judgment should be affirmed.

Argued orally by *A. M. Edwards,* for appellant, and *Rufus Creekmore,* Special Assistant Attorney General, for the state.

ETHRIDGE, J., delivered the opinion of the court.

The appellant, Pendora Magee, was indicted and convicted for the murder of Jesse Magee. The parties, at the time, were working at the camp of, and for, the Great Southern Lumber Company in Simpson county. Jesse and Pendora had married some years before in Jackson, Miss., but each, at the time of said pretended marriage, had living an undivorced spouse. They had had some domestic troubles growing out of appellant's relation's with one Earl Williams, and, on account thereof, Jesse Magee had threatened the life of the appellant.

On the night of the killing, the people living in the camp were attracted by three shots fired and the outcry of the deceased for somebody to come to him, that his wife had killed him. Thereupon these parties went to the residence of Jesse Magee, among them being Dr. White, the camp physician, and found the deceased fatally wounded. He stated to these parties that he was beyond recovery, and the physician, Dr. White, examined him and informed him he had but a few minutes to live, and that, if he had any statement to make or any business to attend to, he had better do it quickly.

After the statements above made, deceased stated to some of these parties that his wife had killed him; that she had come into the room and told him she was going to kill him, and he said, "What for, baby?" and she did not say anything, or to use his language, did not use any words, but began shooting. It was also shown that shortly after the shooting, appellant came hurriedly into the restaurant, or "tonk" as it is called, a place of amusement and gambling, and also a place for selling lunches, and Earl Williams was there, and she told him to come on, that she was ready, and that they both left

there hurriedly and were not seen any more in that vicinity, until arrested and brought back, that the parties were arrested some three weeks afterward, in Belzoni, where they had been going under assumed names.

It was shown in the evidence for the state that about a week prior to that time appellant had had some difficulty with the deceased, in which she attacked him with a knife, but deceased succeeded in disarming her of the knife and overpowering her, and she stated that she would kill him before Saturday night. It was also shown that a few days before the killing the deceased had taken his shotgun and threatened her with death, but that he was disarmed by other parties; that this threat on the part of the deceased was with reference to appellant's relations with said Earl Williams. It was also shown that the appellant, some months before the killing, left the deceased and went to Gulfport, and stayed a while, and then returned.

Appellant testified in her own behalf that, on the evening of the killing, her husband came in, violently threatened her, and told her that he had told her before that he would kill her if he ever saw her with Earl Williams again; that she denied being with Earl Williams on the occasion in question, but he insisted that she had been with him, and made in the direction of the pillow on the bed under which was the pistol, it having been placed under said pillow by the deceased a short while before that; that she also made in the same direction to prevent him from getting it, and she got the pistol first, and he was trying to take the pistol away from her, and she backed toward the door, firing the pistol, under the belief that if he got it he would kill her. She further testified that he was a large strong man, while she was much smaller and weaker, and that, when she got away after the shooting, she did not know whether she had shot him or not; that she ran to the tonk and got Earl Williams, and they left that night, proceeding to Jackson, arriving there early the following morning, finding there

a party with a car going to Belzoni, who desired to take them there for the purpose of employment; that they went that morning to Belzoni, where she secured a job as cook and changed her name.

There was one eyewitness for the state who testified that he saw appellant and deceased as they came out of the door of their cabin, and that deceased grabbed for the pistol and got it away from her.

It was also shown that appellant had bought the pistol shortly before that, and she testified that her husband paid for the pistol, and they both claimed it. She also testified that, prior to her marriage to deceased, each had married and living an undivorced spouse. She further testified that, when she left the deceased and went to Gulfport, deceased agreed if she would return to him that she could do as she pleased and he would do the same.

It is first assigned for error that the verdict and judgment are contrary to the law and the evidence, and it is argued that, under this assignment, there is no real contradiction of appellant's testimony as to how the shooting occurred.

We think there is ample evidence to sustain the conviction. Besides the dying declaration, which we think was competent, the circumstances, coupled with the flight of appellant immediately thereafter, and her going under an assumed name, would amply warrant a verdict against her.

It is next argued that the dying declaration is incompetent, and that the court erred in not requiring Dr. White to testify on the preliminary hearing as to what statement was made by deceased. Dr. White was placed on the stand to testify as to the deceased's condition and his knowledge of impending death, and he testified to those facts, and that the deceased made a statement, but neither the state nor the defendant nor the court asked him what that statement was that deceased made. Other witnesses were introduced to show the statement made

after Dr. White was introduced. Dr. White was examined in the absence of the jury, and it would have been an easy matter for the defendant to have had him examined in reference to what statement was made, for objection could have then been made that he ought not to disclose such statement.

In addition to this, other witnesses testified that some bystander said to the deceased that it might not be as bad as he thought, and that he might not die, but deceased said he would die, and that statement was made after these expressions of opinion.

It is next contended that Polk's evidence, showing the illicit relations between Earl Williams and the appellant, was improper.

Under the circumstances disclosed in the record, the state had to establish its case without the aid of eyewitnesses, other than the dying declaration. It is evident that these illicit relations contributed to the disagreement leading to the killing, and were competent to show a motive for the killing, especially in the light of the subsequent events.

It is next contended that the court erred in granting the instruction to the state reading as follows:

"The court instructs the jury for the state that, if you believe from the testimony in this case, beyond a reasonable doubt, that the defendant, Pendora Magee, did unlawfully, willfully, feloniously, and of malice aforethought, kill and murder deceased, Jesse Magee, in manner and form as charged in the indictment, and not her necessary self-defense, and at a time when she was in no real or apparent danger of losing her own life or sustaining some great bodily harm at the hands of deceased, then in that event, it is your sworn duty to find the defendant guilty as charged, and this is true regardless of every other fact or circumstance of the case."

While the instruction is subject to criticism in referring to the indictment for the manner and form of kill-

ing, certainly, in other respects, it is amply supported by the evidence and is proper.

The defendant procured numerous instructions fully covering the right of self-defense, except she was refused an instruction on this right growing out of or in reference to the disparity of physical strength between herself and the deceased. She requested an instruction upon this phase of the law of self-defense in the following words:

"The court charges the jury for the defendant that, if you believe from the evidence, that the deceased was a much larger and stronger person than the defendant, so much so that the defendant was wholly and absolutely incapable of coping with the deceased in a physical combat, and was liable to receive some serious or great bodily harm and injuries at the hands of the deceased in the event they became engaged in such combat, then the defendant was justified in using a deadly weapon to protect herself from an unjustifiable attack by the deceased, even though the deceased was wholly unarmed, and the defendant was in no danger except such as might be inflicted by the deceased by reason of such physical or greater strength than the defendant, then, in that event it will be the sworn duty of the jury to find the defendant not guilty."

This instruction is incorrect and does not embody the necessary hypothesis that the danger was imminent and pending, really or apparently, and that the appellant believed that she was then and there in danger of receiving such great bodily harm.

It is complained that the outcry of Jesse Magee, with the statement that his wife had killed him, was incompetent, and was not admissible, either under the doctrine of *res gestae,* or as his dying declaration.

We think the statement comes within the doctrine of *res gestae,* but, even if that was not true, it would be harmless here because the appellant testified in her own behalf, and in such testimony admitted that she did kill

him, and the killing was not in dispute, but only the character of the killing was in issue in this case.

The judgment will therefore be affirmed.

*Affirmed.*